IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Luciana Stegeman,<br><br>    Plaintiff,<br><br>  vs.<br><br>Carolyn W. Colvin,<br>Commissioner of Social Security,[1]<br><br>    Defendant. | Civil Action No. 6:13-902-RBH-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

   This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

   The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security finding that she was disabled from May 6, 2008, through March 1, 2010, but denying her claim for disability insurance benefits under Title II of the Social Security Act after that date.

## ADMINISTRATIVE PROCEEDINGS

   The plaintiff filed an application for disability insurance benefits ("DIB") on April 1, 2010, alleging that she became unable to work on May 6, 2008.  The application was denied initially and on reconsideration by the Social Security Administration.  On December 15, 2010, the plaintiff requested a hearing.  The administrative law judge ("ALJ"), before

---

[1]  Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013.  Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

whom the plaintiff and J. Adger Brown, Jr., an impartial vocational expert appeared on May 20, 2011, considered the case *de novo* and, on July 1, 2011, issued a partially favorable decision finding the plaintiff was disabled from May 6, 2008, through March 1, 2010, and that medical improvement occurred after that date such that the plaintiff's disability ended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on January 31, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits after March 1, 2010, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through May 6, 2008, the date the claimant became disabled.

> (2)    The claimant has not engaged in substantial gainful activity since May 6, 2008, the alleged onset date (20 C.F.R §§ 404.1520(b) and 404.1571 *et seq*).

> (3)    At all times relevant to this decision, the claimant has the following severe impairments:  a history of hip fractures and cognitive loss status post closed head injury (20 C.F.R. § 404.1520(c)).

> (4)    Following the claimant's alleged onset date, the claimant had not had an impairment or combination of impairments that met or medically equaled the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d)).

> (5)    After careful consideration of the entire record, the undersigned finds that, from May 6, 2008, through March 1, 2010, the claimant was unable to perform even sedentary unskilled work on a regular and continuing basis (8 hours a day, 5 days per week).

> (6)    From May 6, 2008, through March 1, 2010, as a result of her residual functional capacity as described above, the claimant was unable to perform past relevant work (20 C.F.R. § 404.1565).

(7)    The claimant was born on April 16, 1976, and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. § 404.1563).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)    The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity assessed for the period from May 6, 2008, through March 1, 2010 (20 C.F.R. § 404.1568).

(10)    From May 6, 2008, through March 1, 2010, considering the claimant's age, education, work experience, and residual functional capacity, there were not jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1560(c) and 404.1566).

(11)    The claimant was under a disability, as defined by the Social Security Act, from May 6, 2008, through March 1, 2010 (20 C.F.R. § 404.1520(g)).

(12)    Medical improvement occurred as of March 2, 2010, the date the claimant's disability ended (20 C.F.R. § 404.1594(b)(1)).

(13)    After careful consideration of the entire record, the undersigned finds that, beginning on March 2, 2010, the claimant has had the residual functional capacity to perform a significant range of light work as defined in 20 C.F.R. § 404.1567(b).  The claimant is able to sit, stand, and walk for 6 hours each in an 8-hour day with normal breaks and the freedom to change her position; can lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently; must avoid climbing of ropes, scaffolds, and ladders; can occasionally perform postural activities; cannot work around unprotected heights or dangerous moving machinery; is limited to the performance of simple, routine, and repetitive tasks; and cannot have ongoing interaction with the public.  Such a residual functional capacity is well supported by the weight of the evidence in the record.

14.    The medical improvement that has occurred is related to the ability to work (20 C.F.R. § 404.1594(b)(4)(i)).

15.    Since March 2, 2010, the claimant's age category has not changed (20 C.F.R. § 404.1563).

3

16.    Beginning on March 2, 2010, as a result of her residual functional capacity, the claimant remained unable to perform past relevant work (20 C.F.R. § 404.1565)

17.    Beginning on March 2, 2010, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

18.    Beginning on March 2, 2010, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been able to perform a significant number of jobs in the national economy (20 C.F.R. §§ 404.1560(c) and 404.1566).

19.    The claimant's disability ended on March 2, 2010 (20 C.F.R. § 404.1594(f)(8)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that

4

equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

5

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### Medical Evidence from May 6, 2008, to March 1, 2010

On May 6, 2008, the plaintiff presented to the emergency room after a car she was driving was struck from the side by a Mack truck. She complained of pain in her left hip, but was unsure if she lost consciousness. A CT scan of her head was normal, but CT scans of her pelvis and lower back showed multiple fractures. Robert Hoffman, M.D., diagnosed stable pelvic fracture, recommended partial weight-bearing on the left with weight-bearing as tolerated on the right and prescribed a walker (Tr. 206-32, 234-38).

In August 2009, L. Randolph Waid, Ph.D., examined the plaintiff at the request of her attorney. Dr. Waid concluded that the plaintiff's primary injury was fracture of the pelvis and it was likely she sustained a mild head injury with a period of post-traumatic amnesia and confusion. He found she functioned in the low average to borderline range of intellectual abilities and that this was significantly deviant from expectations considering her level of education (Tr. 310). He stated she demonstrated compromises in her performance on intellectual testing that would be inconsistent with a mild head injury. He found it likely that pain, somatic, and attention difficulties caused her deficient

performance.  He also noted that her performance on a battery of neuropsychological tests showed compromises in her capacity to sustain attention/concentration with slow mental processing speed.  She had severe memory impairment inconsistent with what was expected from residuals of a mild head injury.  He noted she performed quite deficiently on tests assessing visual spatial skills.  He also noted she appeared to have continuing emotional lability; episodic anxiety, and stress; irritability; and fearfulness and increased vigilance when she was in a car.  In summary, Dr. Waid noted a head and brain injury.  He also believed that pain and orthopedic factors contributed to the severity of her deficits (Tr. 303-53).

The following month, the plaintiff returned to Dr. Waid for additional evaluation.   Dr. Waid noted that the plaintiff continued to experience difficulties with attention/concentration and that she could not persist in cognitive focusing due to pain affecting her left side.   The plaintiff reported her memory was not great and she compensated by writing everything down.  The plaintiff's husband reported she used to be good at multi-tasking, noting she used to remember the numbers for members at a country club where she worked before her accident, but subsequently had difficulties sustaining cognitive capacities for any task.  He stated she could not watch a movie because she could only focus for 30 minutes before she had to get up.  Dr. Waid concluded that the plaintiff was compromised in her capacity to sustain attention/concentration and was more forgetful in her daily pursuits.   He believed her pain was a causal factor for her compromised attention/concentration.  He also believed she experienced a concussion that might be contributing to the compromises she experienced in her neurocognitive functioning on a day-to-day basis (Tr. 471-72).

In October 2009, Robert Brabham, Ph.D., examined the plaintiff at the request of her attorney.  The plaintiff complained of behavioral and cognitive changes as well as mobility limitations and balance problems.  Dr. Brabham found the plaintiff had good eye

7

contact; easily understood speech; and average intellectual functioning. The plaintiff described herself as being depressed and anxious. Dr. Brabham found the plaintiff demonstrated almost every clinically significant indicator of physical brain injury. He assigned her a 22 percent impairment rating and noted she had marked physical limitations and restrictions that prevented her from performing the full range of job duties that her past employment required. Dr. Brabham found the plaintiff demonstrated signs and symptoms of moderate to severe depression. He diagnosed depressive disorder, cognitive disorder secondary to a traumatic brain injury, generalized anxiety disorder, and pain disorder. He stated she had marked limitations in maintaining concentration and attention to details with due consideration to her pain, depression, and anxiety. He stated she appeared credible in her description of her limitations and functional abilities. He also stated she experienced significant pain in her pelvis and legs sufficient to interfere with her ability to sustain physical activity. She had cognitive deficits that caused difficulty in her ability to pay attention to job tasks. He opined that her limitations on sitting for extended periods would preclude even extended sedentary work and, at that time, she remained unable to perform any substantial gainful work activity existing in the national economy (Tr. 480-88).

### Medical Evidence after March 1, 2010

The plaintiff presented to Global Family Medicine on March 2, 2010, complaining of chronic pain that was difficult to control. She also complained of fatigue, easy distractibility, and inability to concentrate. She reported she wanted to decrease her pain medications so she could start trying to get pregnant. She also reported she planned to pursue *in vitro* fertilization. Chronic pain, attention deficit without hyperactivity, and pelvic fracture were diagnosed and Vicoprofen, a combination narcotic nonsteroidal anti-inflammatory medication, and Vyvanse, an ADHD medication, were prescribed (Tr. 626-28).

One week later, on March 9, 2010, the plaintiff visited Global Family Medicine with chronic lumbar back pain and reported she was leaving for Mexico the following day

8

and would be gone for two weeks and requested additional pain medications. She had tenderness in her lower back, but an otherwise normal examination of her back and hips, including full muscle strength and tone. It was noted that the plaintiff was addicted to opioids, and she was prescribed Vicoprofen (Tr. 624-25).

On March 18, 2010, the plaintiff presented to Gaston Perez, M.D., and admitted to over-using her pain medication. Dr. Perez prescribed Suboxone to help her with this problem. Dr. Perez found the plaintiff had a normal examination of her legs, including full muscle strength, bulk, and tone. She had normal ranges of motion; normal muscle strength and tone in her hips; and normal gait. She also had intact reflexes and sensation and normal coordination. The plaintiff was also diagnosed with anxiety and depression and was prescribed antidepressant medication and Vyvanse (Tr. 629-33).

On March 23, 2010, the plaintiff was treated by Richard Ford, M.D., a psychiatrist, for problems with anxiety/mood symptoms, restlessness, poor focus/concentration, inability to sit, and decreased attention span. She complained of pain with mobility. She reported she hired an attorney who sued the trucking company involved in her accident and this suit settled less than a month prior. She described her typical day as using the computer, doing crossword puzzles, and watching television. She reported that Zoloft helped her mood. She also reported she was considering adopting a child or undergoing *in vitro* fertilization and was planning to build a home. Dr. Ford found the plaintiff had some sadness and tearfulness, but good mood, affect, insight, and judgment; linear thought processes; and no abnormalities of thought content. He diagnosed anxiety, depression, and cognitive disorder. He continued the plaintiff's antidepressant medications and increased Vyvanse (Tr. 853-54). Six days later, on March 29, 2010, the plaintiff saw Dr. Perez again with complaints of chronic left hip joint pain. Dr. Perez repeated his March 18, 2010, findings. He diagnosed chronic pain, depression, and "pelvic fracture OT closed

(left side)." He advised the plaintiff not to abuse Vicoprofen and only take two to three per day (Tr. 643-47).

On March 30, 2010, the plaintiff saw her pain management physician, David Brosman, M.D., complaining of left-sided pelvic pain. Her urine drug screen was appropriate (Tr. 679).

On April 12, 2010, the plaintiff told Dr. Perez that she fell and injured her hip while walking her dog. She complained of muscle and lower left leg pain. Dr. Perez diagnosed back and limb pain; anxiety; osteoarthritis; and attention deficit without hyperactivity and prescribed Vyvanse and Vicoprofen, which the plaintiff promised not to take more than three of each day (Tr. 641-42).

On April 22, 2010, the plaintiff was treated for her right hip problems by Edward Whelan, M.D., at Southeastern Orthopedic Center in Savannah, Georgia. Dr. Whelan noted "some question of early degenerative disease, as well as impingement" (Tr. 806).

The plaintiff returned to Dr. Ford on April 27, 2010, reporting she "f[elt] great" and "wonderful"; had an "excellent" energy level; and that her "life [was] so good right [then]." She reported building a new home; purchasing new cars for herself and her husband; babysitting for children (18 months and three years old); and she was considering adoption or *in vitro* fertilization in June. The plaintiff reported that stimulants improved her attention and concentration, and Dr. Ford continued those medications (Tr. 852). Two days later, on April 29th, a left hip MRI study showed an anterior superior labral tear (rim of fibrocartilage in the socket of the hip joint) (Tr. 811).

On May 3, 2010, the plaintiff was treated by Dr. Whelan for left hip pain (Tr. 803). Dr. Whelan indicated surgery for her torn labrum and noted that her "overall problem is caused by her pelvic malignment from her motor vehicle injury. She has internal rotation of the left hemipelvis. She has a well-healed sacral fracture that is shortened on the ala.

This tends to give her an increased center edge angle, which is probably causing some pincer type impingement" (Tr. 803).

On May 13, 2010, the plaintiff told Dr. Brosman that Vicoprofen did not work, so she stopped taking it, and did not bring it with her when house sitting in Sea Pines.  Dr. Brosman diagnosed pelvic fracture and recommended a trial of Percocet or an increase dosage of Vicoprofen.  The plaintiff said she would try to increase her medication (Tr. 677).

On May 19, 2010, the plaintiff underwent diagnostic and operative arthroscopy with labral debridement and acetabuloplasty (plastic surgery to the concave surface of the pelvis), and excision of a lesion.  Dr. Whelan performed the surgery (Tr. 704-53).

On May 25, 2010, the plaintiff returned to Dr. Ford, reporting she was "stress free since [her personal injury] case settled."   She complained of poor attention/concentration and that she "live[d] by 'post-its.'"  She discussed purchasing a boat for her home and described an average day as doing crossword puzzles, playing Sudoku, and helping market her husband's business.  She was still considering adoption and visiting with a fertility specialist.  Dr. Ford continued her medications (Tr. 851).

On June 1, 2010, the plaintiff was treated in Dr. Whelan's office by a nurse practitioner.  While she indicated no pain at that time, the treatment notes indicate that she was prescribed Percocet for pain by her primary care physician and that the orthopedic office would not be prescribing pain medications (Tr. 802).  Dr. Brosman also saw the plaintiff on June 1st and prescribed Percocet for her pain (Tr. 769).

On June 15, 2010, Dr. Brosman noted that Dr. Whelan called him to report that the plaintiff was getting prescriptions from multiple sources.  Affordable Health also contacted Dr. Brosman, stating that the plaintiff requested medication from them.  Dr. Brosman noted he prescribed Percocet on June 1, 2010, and gave the plaintiff 20 Vicoprofen the prior weekend after she claimed Percocet was too strong.  The plaintiff reported using all these medications and admitted she "ha[d] been a very bad girl."  She

apologized for her misuse of medications and multiple lies, but reported her brain injury made her forgetful. Dr. Brosman noted the plaintiff was noncompliant with a patient responsibility agreement, and he would not prescribe medications (Tr. 768).

On June 22, 2010, the plaintiff told Dr. Ford she was doing well with a good mood, no anxiety, and improved attention and concentration with Vyvanse, and he continued her medications (Tr. 850).

On July 4, 2010, the plaintiff was seen at Doctor's Care for pelvic pain. She was prescribed Voltaren and Flexeril (Tr. 875). On July 6, 2010, the plaintiff complained to Dr. Brosman of left pelvic pain, but reported she was more active helping her husband with his catering business. Dr. Brosman diagnosed drug seeking behavior. He offered the plaintiff Tramadol (narcotic-like pain reliever), but she requested discharge so she could obtain prescriptions from other physicians (Tr. 767). On July 14, 2010, Dr. Brosman noted the plaintiff had a urine drug screening was positive for Tramadol, which he did not prescribe. This was her last date of treatment with Dr. Brosman. He noted he would forward her medical records to her new provider, which included notes that she was not compliant with treatment (Tr. 766).

On July 15, 2010, Cashton Spivey, Ph.D., performed a psychological examination on the plaintiff at the request of the state agency. The plaintiff reported intermittent headaches and significant memory difficulties. She also reported depression, low energy, problems with attention and concentration, and crying spells. She reported she could bathe and dress herself, read a newspaper, perform simple math calculations, vacuum, do laundry, and put puzzles together. Dr. Spivey found the plaintiff could not perform serial sevens, but could spell the word "world" backwards, recall two of three objects at five minutes, follow a three step command, and accurately reproduce a drawing. She had a satisfactory general fund of information, fair abstract reasoning skills, and fair to good insight and judgment. Dr. Spivey estimated her intelligence was in the average to

low average range.  He found she had logical and coherent thought processes and fair attention and concentration.  He diagnosed depressive disorder and status post-head trauma (Tr. 797-99).

On July 19, 2010, x-rays showed the plaintiff had well maintained joint spaces in her hip and complete excision of her lesion.  She continued to complain of pain, but she had excellent range of motion.  Dr. Whelan stated she would continue to improve (Tr. 801).  That same day, the plaintiff presented to Jonathan Sack, M.D., claiming she was permanently disabled.  Dr. Sack diagnosed mood disorder and pelvic fracture (Tr. 942-43).  The following day, Jim Liao, M.D., a state agency physician, reviewed the evidence and found that the plaintiff had functional abilities consistent with a range of light work that did not require more than occasional climbing, stooping, crouching, and crawling and allowed her to avoid concentrated exposure to hazards (machinery, heights, etc.) (Tr. 820-27).

On July 23, 2010, the plaintiff told Dr. Ford she was "doing really good" and was "very happy" with plans to go on vacation to Mexico and to a wedding in Ohio.  Dr. Ford noted the plaintiff benefitted from stimulants to improve attention and concentration and continued her medications (Tr. 849).  On July 24, 2010, the plaintiff was seen at Doctor's Care for pain in her left hip and knee after a fall (Tr. 848).  She was seen at Doctor's Care again on August 4, 2010, complaining of hip and leg pain and contusions of her left hip and knee.  She was given a prescription for Vicoprofen ( Tr. 859).

On August 10, 2010, Olin Hamrick, Jr., Ph.D., a state agency psychologist, reviewed the evidence and found that the plaintiff could perform simple, repetitive work tasks in a setting that did not require ongoing interaction with the public (Tr. 828-45).

On August 31, 2010, the plaintiff complained to Dr. Ford of poor attention and concentration.  She reported going to her step-son's wedding in Cincinnati and on vacation to Mexico.  She also reported she tried to assist her husband with his catering business with

hiring and managing employees, although she found this to be "overwhelming."  Dr. Ford adjusted her medications (Tr. 848).

In September 2010, the plaintiff was again treated at Doctor's Care for chronic hip pain and depression.  She saw Dr. Ford on September 7, 2010 for problems with attention/concentration and anxiety/depression (Tr. 847, 856).  On September 10, 2010, the plaintiff told Dr. Sack that she wanted to "get [o]ff" of Vicoprofen, and Dr. Sack prescribed Suboxone (Tr. 940-41).  She subsequently told Dr. Sack that Suboxone was working, and Dr. Sack found she had normal gait and hip ranges of motion and continued her medications (Tr. 934-37), findings he repeated in each of the successive four months (Tr. 917-22, 924-27, 929-33)

On October 13, 2010, Lisa Varner, Ph.D., a state agency psychologist, reviewed the evidence and found the plaintiff could perform simple, repetitive work tasks in a setting that did not require ongoing interaction with the public (Tr. 891-904, 913-16).  That same day, Tom Brown, M.D., a state agency physician, reviewed the evidence and reached essentially the same conclusions as Dr. Liao (Tr. 905-12).

The plaintiff saw Dr. Sack on October 25, 2010, and complained of depression and demotivation.  She indicated that she could not tolerate Suboxone and Dr. Sack changed her medication to Subutex (Tr, 926, 927).

On November 4, 2010, the plaintiff told Dr. Sack she was doing well on Subutex (Tr. 924-25).  On November 30, 2010, the plaintiff complained to Dr. Ford of anxiety and requested Valium and reported improved attention with Vyvanse (Tr. 950).  In December 2010, the plaintiff told Dr. Sack she was doing well off all medications and felt well with no complaints (Tr. 921-22).

On January 3, 2011, the plaintiff complained to Dr. Sack of fatigue and lack of energy and motivation, and Dr. Sack prescribed antidepressant medications (Tr. 917-20).  On January 14, 2011, the plaintiff saw Dr. Sack for depression and mood disorder.  She

was prescribed Wellbutrin (Tr. 917-18). That same month, the plaintiff complained to Dr. Ford of decreased energy and sadness. Dr. Ford diagnosed anxiety disorder and attention deficit status post-head injury. He continued the plaintiff's medications and considered prescribing another antidepressant (Tr. 946). On February 11, 2011, the plaintiff complained of tearfulness, but reported she was moving into a new home the following month and was hosting a charity event for the Red Cross, and Dr. Ford adjusted her medications (Tr. 945). In April 2011, the plaintiff complained to Dr. Ford of forgetfulness, and Dr. Ford continued her medications (Tr. 944).

In late 2010 or early 2011, Dr. Ford filled out a "Medical Report for Prospective Foster/Adoptive Parent" and stated the plaintiff's mental impairments would not necessarily limit her ability to care for a child, although he had not evaluated such ability. He certified that the plaintiff had no physical or cognitive limitations that would prevent her from parenting. He stated he had not directly assessed her ability to parent, but that she had no overt cognitive limitations (Tr. 948-49). In a post-hearing letter dated June 24, 2011, Dr. Ford stated that he completed a questionnaire with regard to the plaintiff adopting a child in late 2010 or early 2011. He stated that while recent office visits did not suggest any overt cognitive impairment, he had not ordered any neuropsychological testing, and, therefore, he deferred to the evaluations of Drs. Waid (August 2009) and Brabham (October 2009) regarding her functional ability "at this time" (Tr. 954).

### Hearing Testimony

At the administrative hearing, the plaintiff testified she was not able to work because she could not sit or stand for very long and had chronic pain. She stated she could not focus for significant time periods (Tr. 49). Following her hip fracture, she reported that she required a walker and cane for an extended period and underwent physical therapy (Tr. 52-53). She reported she could sit for less than 30 minutes before having to change position. She stated she might be able to walk a quarter of a mile (Tr. 54-55). She reported

15

she had difficulty focusing and following instructions and had to make notes and lists to remember to do things (Tr. 55-56). She admitted to a period of drug seeking behavior, but testified she had gotten off all pain medications and used baths, showers, and Advil for pain relief. She stated she sat in a recliner for four hours per day with her feet elevated (Tr. 56-57, 59). She testified she walked around a pool and participated in water therapy at her own pace (Tr. 60).

The ALJ asked J. Adger Brown, Jr., a vocational expert, to assume a hypothetical individual of the plaintiff's age, education, and work experience who could:

> sit six hours in an eight-hour workday with normal breaks and stand and walk six hours in an eight-hour day with normal breaks but with the freedom to change positions. She c[ould] lift 20 pounds occasionally and 10 pounds frequently. She c[ould] push and pull within th[ose] pound limits . . . [s]he should avoid climbing ropes, ladders, and scaffolds; otherwise, she c[ould] perform postural activities occasionally . . . [s]he must avoid unprotected heights and dangerous machinery. She [was] limited to simple, routine, repetitive tasks without ongoing interaction with the general public.

(Tr. 67). The vocational expert testified such an individual could perform the jobs of cashier, stock and inventory clerk, and assembler (Tr. 67-69).

## ANALYSIS

The plaintiff was 35 years on the date of the ALJ's decision. She is a college graduate and has past work experience as a career counselor, beverage cart attendant, cashier, dental assistant, retail salesperson, and lifeguard (Tr. 44, 47, 66, 144-53, 159, 160, 167-74). As set forth above, the ALJ found that from May 6, 2008, to March 1, 2010, the plaintiff was unable to perform even sedentary unskilled work on a regular and continuing basis (Tr. 22-23). She found that, during that time period, the plaintiff was unable to perform her past relevant work (Tr. 23) and also that there were no jobs that existed in the national economy that the plaintiff could have performed (Tr. 23-24). (Tr. 24). The ALJ further found that medical improvement occurred as of March 2, 2010, and, beginning that

16

date, the plaintiff had the residual functional capacity ("RFC") to perform a range of light work with limitations as set forth in the hypothetical question to the vocational expert (Tr. 24-28). The ALJ found that, beginning March 2, 2010, the plaintiff remained unable to perform her past relevant work, but, based on the vocational expert testimony, she could perform other work existing in significant numbers in the national economy, including the jobs of cashier, stock/invoice clerk, and assembler (Tr. 28-29). Therefore, the ALJ found the plaintiff's disability ended on March 2, 2010 (Tr. 29). The plaintiff argues that the ALJ erred in failing to follow the treating physician rule and in grossly overestimating her level of functioning (pl. brief at pp. 10-11).

As discussed above, the ALJ found that medical improvement occurred as of March 2, 2010 (Tr. 24). Medical improvement is any decrease in the medical severity of a claimant's impairment as established by improvement in the symptoms, signs, and/or laboratory findings. 20 C.F.R. § 404.1594(b)(1). The ALJ further found that the medical improvement was related to the ability to work (Tr. 28). Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities. *Id.* § 404.1594(b)(3). Here, substantial evidence supports the ALJ's finding that, as of March 2, 2010, the plaintiff had the RFC to perform light work that allowed her to change positions and avoid climbing of ropes, scaffolds, and ladders, and did not require more than occasional postural activities, work around unprotected heights or dangerous moving machinery, or more than simple, routine, and repetitive tasks, or ongoing interaction with the public (Tr. 24).

With regard to her physical impairments, on March 9, 2010, while the plaintiff had tenderness in her lower back, she had an otherwise normal examination of her back and hips, including full muscle strength and tone (Tr. 624-25). On March 18, 2010, Dr. Perez found the plaintiff had a normal examination of her legs, including full muscle strength, bulk, and tone. She had normal ranges of motion; muscle strength and tone in

17

her hips; and gait. She also had intact reflexes and sensation and normal coordination (Tr. 629-33). On July 19, 2010, following the plaintiff's May 2010 surgery, x-rays showed she had well maintained joint spaces in her hip and complete excision of her lesion, and Dr. Whelan stated she would continue to improve (Tr. 801). In September 2010, Dr. Sack found the plaintiff had normal gait and hip ranges of motion (Tr. 934-37), findings he repeated in each of the successive four months (Tr. 917-22, 924-27, 929-33). In December 2010, the plaintiff told Dr. Sack she was doing well off all medications and felt well with no complaints (Tr. 921-22).

The ALJ gave "some weight" to the opinions of the state agency physicians who reviewed the plaintiff's medical records (Tr. 27). On July 20, 2010, Dr. Liao reviewed the evidence and found that the plaintiff had functional abilities consistent with a range of light work that did not require more than occasional climbing, stooping, crouching, and crawling and allowed her to avoid concentrated exposure to hazards (machinery, heights, etc.) (Tr. 820-27). In October 2010, Dr. Brown reviewed the evidence and reached essentially the same conclusions as Dr. Liao (Tr. 905-12). *See* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."); *Smith v. Schweiker*, 795 F.2d 343, 345-46 (4th Cir. 1986) (stating that a non-examining physician's opinion can be relied upon when it is consistent with the record and that, "if the medical expert testimony from examining or treating physicians goes both

ways, a determination coming down on the side of the non-examining, non-treating physician should stand").

With regard to her mental impairments, in late 2010 or early 2011, treating psychiatrist Dr. Ford filled out a "Medical Report for Prospective Foster/Adoptive Parent" stating the plaintiff's mental impairments would not necessarily limit her ability to care for a child, although he had not evaluated such ability. He certified that the plaintiff had no physical or cognitive limitations that would prevent her from parenting. He stated he had not directly assessed her ability to parent, but that she had no overt cognitive limitations (Tr. 948-49). On June 24, 2011, Dr. Ford stated in a letter that he had completed a questionnaire with regard to the plaintiff adopting a child in late 2010 or early 2011. He stated that while recent office visits did not suggest any overt cognitive impairment, he had not ordered any neuropsychological testing, and, therefore, he deferred to the evaluations of Drs. Waid (August 2009) and Brabham (October 2009) regarding her functional ability "at this time" (Tr. 954).

The plaintiff argues that "there does not exist persuasive contradictory evidence to rebut the opinion of Dr. Ford that the functional impairments stated by Dr. Waid in August 2009 (Tr. 303-353) and Dr. Brabham in October 2009 (Tr. 480-503) were still in effect at the time Dr. Ford wrote his letter dated June 24, 2011 (Tr. 954)" (pl. brief at p. 11).

The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a

patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

Here, as the ALJ found (Tr. 26-27), Dr. Ford's July 2011 opinion was inconsistent with his earlier opinion that the plaintiff had no physical or cognitive limitations that would preclude parenting (Tr. 948-49). *See* 20 C.F.R. § 404.1527(c)(4) (stating an ALJ must consider consistency). Further, as the ALJ found, even if Dr. Ford asserted that parenting was a skilled activity, nothing in his later statement would preclude the plaintiff from performing unskilled work (*see* Tr. 954). Reviewing the opinions of Drs. Waid and Brabham, the ALJ found that, while both agreed as to deterioration of the plaintiff's functioning prior to March 2010, neither offered a bottom line as to her specific mental limitations (Tr. 27; *see* Tr. 303-53, 471-72, 480-88). Further, the ALJ noted that Dr. Ford saw the plaintiff more frequently than Drs. Waid and Brabham (Tr. 27; *see* Tr. 848-53,

944-46, 950, 952, 956). *See* 20 C.F.R. § 404.1527(c)(2)(i) (stating an ALJ should consider whether a treating source has seen the claimant "a number of times and long enough to have obtained a longitudinal picture" of the claimant's impairment). The ALJ also noted that Dr. Ford is a psychiatrist, who should better understand the plaintiff's capacity to function (Tr. 27). *See id.* § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

The ALJ also noted that Dr. Ford's own treatment records showed improvement with the use of medication after March 1, 2010 (Tr. 27-28). Specifically, on March 23, 2010, while Dr. Ford found the plaintiff had some sadness and tearfulness, she had a good mood, affect, insight, and judgment; linear thought processes; and no abnormalities of thought content (Tr. 853-54). In April 2010, the plaintiff told Dr. Ford she "f[elt] great" and "wonderful"; had an "excellent" energy level; and that her life [was] so good right [then]" (Tr. 852). In June 2010, she told Dr. Ford that she was doing well with a good mood, no anxiety, and improved attention and concentration with Vyvanse (Tr. 850). The following month, she told Dr. Ford she was "doing really good" and was "very happy" with improved attention and concentration (Tr. 849). In August 2010, the plaintiff denied any problems with depression or anxiety but complained of poor attention/concentration, and her Vyvanse was increased to target this issue. She was assessed with a Global Assessment of Functioning ("GAF")[3] of 60 to 65 (Tr. 848). An ALJ can discount the opinions of a treating physician where they are inconsistent with the physician's own treatment records. 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant

---

[3]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score of 61-70 indicates mild symptoms or some difficulty in social, occupational, or school functioning. *Id.*

evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion").

The ALJ also noted (Tr. 28) that a finding of medical improvement as of March 2, 2010, was supported by other evidence. In July 2010, Dr. Spivey examined the plaintiff and found that, while the plaintiff could not perform serial sevens, she could spell the word "world" backwards, recall two of three objects at five minutes, follow a three step command, and accurately reproduce a drawing. She had a satisfactory general fund of information; fair abstract reasoning skills; and fair to good insight and judgment. Dr. Spivey rated the plaintiff's intelligence as average to low average and found she had logical and coherent thought processes and fair attention and concentration (Tr. 797-99). The ALJ also noted that medical records from September 2010 to January 2011 continued to reveal that the plaintiff had appropriate insight with no confusion noted (Tr. 28; *see* Tr. 917-43). An ALJ can discount the opinion of a treating physician where it is inconsistent with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4) (stating an ALJ must consider whether an opinion is consistent with the record as a whole).

The ALJ also gave "some weight" to the opinions of the state agency psychologists (Tr. 27). On August 10, 2010, Dr. Hamrick reviewed the evidence and found that the plaintiff could perform simple, repetitive work tasks in a setting that did not require ongoing interaction with the public (Tr. 828-45). On October 13, 2010, Dr. Varner reviewed the evidence and found the plaintiff could perform simple, repetitive work tasks in a setting that did not require ongoing interaction with the public (Tr. 891-904, 913-16).

In finding that medical improvement occurred as of March 2, 2010, the ALJ also considered the plaintiff's subjective complaints (Tr. 24-26). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

22

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective

medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4.  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id*.

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

24

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. § 404.1529(c).

The ALJ found that while the plaintiff's impairments could reasonably be expected to cause some of the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not fully credible (Tr. 24-26).  As the ALJ found, the objective medical evidence was inconsistent with the degree of symptomology and limitation that the plaintiff alleged (Tr. 25), which included the findings of Drs. Perez (Tr. 629-33), Sack (Tr. 917-22, 924-27, 929-37), Ford (Tr. 848-54, 944-46, 950, 952), and Spivey (Tr. 797-99), as well as the imaging studies in the record (Tr. 801) discussed above.

The ALJ further found that the plaintiff's activities of daily living undermined the credibility of her subjective complaints (Tr. 25-26).  On March 2, 2010, the plaintiff reported she planned to pursue *in vitro* fertilization (Tr. 626-28).  A week later, she reported she was leaving for Mexico the following day and would be gone for two weeks (Tr. 624-25).  On March 23, 2010, the plaintiff described her typical day as using a computer, doing crossword puzzles, and watching television.  She reported she was considering adopting a child or undergoing *in vitro* fertilization and planning to build a home (Tr. 853-54).  The following month, she reported building a new home, purchasing new cars for herself and her husband, babysitting for children (18 months and three years old), and considering adoption or *in vitro* fertilization (Tr. 852).  In May 2010, she reported house sitting in Sea Pines (Tr. 677).  She also discussed purchasing a boat and stated that she did crossword

25

puzzles, played Sudoku, and helped market her husband's business. She was still considering adoption and visiting with a fertility specialist (Tr. 851). In July 2010, the plaintiff told Dr. Brosman that was more active helping her husband with his catering business (Tr. 767). She told Dr. Spivey that she could bathe and dress herself, read a newspaper, perform simple math calculations, vacuum, do laundry, and put puzzles together (Tr. 797-99). The following month, she reported going to her step-son's wedding in Cincinnati and on vacation to Mexico. She also reported she tried to assist her husband with his catering business with hiring and managing employees, although she found this to be "overwhelming" (Tr. 848). In September 2010, she reported helping her husband with his business as "executive director," was considering adopting a child, and was selling her house (Tr. 952). In February 2011, she reported she was moving into a new home the following month and was hosting a charity event for the Red Cross (Tr. 945). *See* 20 C.F.R. § 404.1529(c)(3)(i) (stating an ALJ must consider a claimant's daily activities); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) ("The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life.").

As the ALJ further found, the plaintiff's drug seeking behavior also detracted from her credibility (Tr. 26). In June 2010, Dr. Brosman noted that the plaintiff was getting prescriptions from multiple sources. He noted he prescribed Percocet on June 1, 2010, and gave the plaintiff 20 Vicoprofen the prior weekend after she claimed Percocet was too strong. She reported she used all of these medications and admitted she "ha[d] been a very bad girl." She apologized for her misuse of medications and multiple lies. Dr. Brosman noted that the plaintiff was not compliant with her patient responsibility agreement (Tr. 768). The following month, Dr. Brosman diagnosed drug seeking behavior (Tr. 767). At the administrative hearing, the plaintiff admitted to a period of drug seeking behavior (Tr. 56-57, 59). *See* 20 C.F.R. § 404.1529(c)(3)(vii) (stating an ALJ may consider "other factors"). Based upon the foregoing, the undersigned finds no error in the ALJ's

26

consideration of the medical opinions and the plaintiff's credibility.  Furthermore, the ALJ's medical improvement and RFC findings are based upon substantial evidence and are free of legal error.

### **CONCLUSION AND RECOMMENDATION**

Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.


s/ Kevin F. McDonald
United States Magistrate Judge

July 21, 2014
Greenville, South Carolina

27